**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF MISSOURI**
**WESTERN DIVISION**

| | |
|---|---|
| MICHAEL CARTER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Case No. 4:13-CV-00814-FJG |
| v. | ) |
| | ) |
| CSL PLASMA INC. | ) |
| | ) |
| Defendant. | ) |

## <u>ORDER</u>

Pending before the Court is Defendant CSL Plasma Inc.'s Motion for Summary Judgment (Doc. No. 48).

## I.      Statement of Facts[1]

CSL Plasma is a blood plasma collection company headquartered in Boca Raton, Florida, with operations throughout the United States, including a facility at 6000 Independence Ave., Kansas City, Missouri.   CSL Plasma maintains an Equal Employment Opportunity Policy.   CSL Plasma also maintains written employment policies prohibiting discrimination, harassment and retaliation in the workplace.

The Employee Handbook contains policies related to Attendance Standards and Absence Without Notice. (Employee Handbook Policies, Attendance Standards and Absence Without Notice, Doc. No. 49, Ex. 4). The Attendance Standards policy states, "Failure to notify the Manager of an absence or late arrival within the agreed-upon timeframe or continuous attendance occurrences may be grounds for corrective action or termination of employment." (Id.). The Absence Without Notice policy states, "Employees who fail to call or show for work to explain their absence prior to the start of their scheduled work hours may be subject to Corrective Action or termination. (Id.).

---

[1] To the extent that facts are controverted, the Court has set out the nature of the controversion within this statement.

In addition to the policies in the Employee Handbook, CSL Plasma maintains a separate written attendance policy. The Attendance Policy provides that an employee will receive a verbal coaching after two unscheduled absence occurrences, which includes a full day or any portion of the day when an employee is away from work when the employee is scheduled to work, within a six month rolling period. (Attendance Policy, Doc. No. 49, Ex. 5). The Attendance Policy also provides for a written coaching after four unscheduled absence occurrences within a six month rolling period and a first written warning after six unscheduled absence occurrences within a six month rolling period. (Id.). The Attendance Policy states that an employee will receive a final written warning after seven unscheduled absence occurrences or 1-2 days of No Call/No Show, and termination of employment after eight "unscheduled absences occurrences, 1-2 days of No Call/No show, the second occurrence, or three (3) days of No Call/No Show (first occurrence)." (Id.). The Attendance Policy also states that "Failure to maintain a satisfactory attendance record will be grounds for 'corrective action' or termination." (Id. at Section 1.2, Doc. No. 49, Ex. 5). "The language used in this policy is not intended to create, nor should it be construed to constitute, a contract between CSL [Plasma] and its employees." (Id. at Section 4.3, Doc. No. 49, Ex. 5).[2]

---

[2] Plaintiff states this fact is "uncontroverted in part," and then argues that Heatherman testified that plaintiff did not have three days of no call/no show at the time of his termination on December 13, 2012, and that she violated company policy by terminating him with only two days of no call/no show. The Court agrees with defendant, however, that plaintiff has completely misconstrued Heatherman's testimony. Her actual testimony is as follows:

"Q. You'd also agree with me that if you terminated on his first occurrence of two days no call/no shows, that would be a violation of this employment policy?

A. Yes. But keep in mind that we have the ability, based upon previous corrective actions to escalate to termination where necessary." (Heatherman Dep. 202:1-7, Ex. 28).

CSL Plasma also has a policy requiring employees to wear personal protective equipment, which for the facility where Carter worked required that he wear proper shoes that would not allow blood or fluids to seep through the material. CSL Plasma also maintains a Center Exposure Control Plan which provides, "Personal protective equipment will be considered 'appropriate' only if it does not permit blood or other potentially infection materials to pass through to reach the employee's work clothes, street clothes, undergarments, skin, eyes, mouth, or other mucous membranes under normal conditions of use." Carter received training on the Center Exposure Control Plan on April 11, 2012.

Rebecca Heatherman is an employee of CSL Plasma who now resides in Boca Raton, Florida in her current role as Senior Manager, Quality Systems. Among other positions, CSL Plasma previously employed Heatherman as a Quality Manager and then a Center Manager at its facility at 6000 Independence Ave., Kansas City, Missouri.

Plaintiff Michael Carter began working for CSL Plasma on April 10, 2012 as a full time Material Handler. The Employee Handbook and all of the personnel policies are maintained and available to all employees, including Carter, on CSL Plasma's intranet site, Teamlink. Carter received the New Hire Orientation Program that discusses CSL Plasma's policies prohibiting discrimination and retaliation, attendance, dress code and the proper protective equipment (Center Exposure Control Plan) that CSL Plasma

"Q. Okay. So you would agree with me nowhere in here does it say you can terminate an employee for two days of no call/no show?
. . .
A. Again, as an employee of CSL Plasma and as a manager, we have the opportunity to elevate or escalate based on the entire six-month rolling history, which I mentioned is in 7.3, and 4.3. I don't have it in front of me, but I believe our employee handbook further outlines our attendance policy process, but I don't have that in front of me." (Id. at 203:25-204:13).

3

expects employees to wear in early April 2012. Carter again reviewed the Attendance Policy, the Dress Code policy, the Center Exposure Control Plan and the Center New Hire Orientation Welcome and Overview Presentation on August 8, 2012.

On April 27, 2012, CSL Plasma provided Carter with a verbal coaching regarding his attendance because he was tardy on April 17, 2012 and April 27, 2012. Thomas Denn delivered the verbal coaching on April 27, 2012. On May 17, 2012, CSL Plasma noted in Carter's employee file, through a Memo to File, that Carter had his personal laptop in the warehouse to listen to music in violation of company policy.[3] On June 8, 2012, a complaint was made that plaintiff was observed to be on the phone during working hours. Because of discrepancies in the write-up (including purported witnesses saying they did not witness plaintiff using his phone), Denn issued a Memo to File instead of the performance corrective action. (Denn Memo to File Dated 6/8/2012, Doc. No. 49, Ex. 15). On June 12, 2012, CSL Plasma gave Carter a written coaching regarding his attendance because he was again tardy on May 4, 2012 and June 12, 2012. Denn delivered the attendance written coaching on June 12, 2012. (Attendance Corrective Action Report Dated 6/12/2012, Doc. No. 49, Ex. 16).[4]

---

[3] Plaintiff states this fact is "uncontroverted in part," and notes that plaintiff's male supervisor, Denn, testified that "This is a letter that I was directed by Rebecca Heatherman to write. I did not witness this, but I was told to go ahead and write it to create a memo to file for his performance." When asked by Defendant "[w]as providing this to Mr. Carter discriminatory?" Mr. Denn responded "I don't—at the time, I don't believe anybody else was being given memos to file. This was the first memo to file for performance that I had to give per Rebecca Heatherman." (Denn Dep., Doc. No. 51, Ex. 3, 29:2 – 30:36). As noted in defendant's reply, however, the memo to file speaks for itself and is not controverted by Denn's testimony.

[4] Plaintiff attempts to controvert this fact by indicating that Denn, who delivered the coaching (and who has filed his own discrimination lawsuit against defendant, see Case No. 13-CV-1015-DGK), testified that he believed that plaintiff was being targeted, saying, "There were many employees that would get overlooked for their tardiness." "If you go in and you looked at the actual schedules as they come in for their functions, anybody that's over a certain number should have attendance—should have an

Carter wrote on his June 12, 2012 Attendance Corrective Action Report that he believed that it was "BACKLASH" because of the inaccurate draft corrective action from June 8, 2012. (Attendance Corrective Action Report Dated 6/12/2012, Doc. No. 49, Ex. 16). Although the "BACKLASH" comment does not reflect discrimination based on gender, Carter testified he believed he was being reprimanded because of his gender and he reported his beliefs to "the supervisors that were male that would listen." Carter Dep., Doc. No. 51 Ex. 4, 143:17-21. Those employees included Tom Denn, Ken Lain, and Justin Gronbach. Id. 144:2-19. Plaintiff said he could not recall a date that these reports were made. Id. at 144:20-25.

Denn and Heatherman met with Carter on June 14, 2012 to discuss his comment about the attendance corrective action allegedly being "backlash." Heatherman reviewed the performance and attendance corrective action processes with Carter, and she asked if there were any other concerns. Carter expressed none. The meeting concluded upon Heatherman's determination that "there seems to be no retaliation to report." (Denn Handwritten Notes dated 6/14/2012, Doc. No. 49, Ex. 17; Denn Dep.,

---

attendance corrective action, okay." "A lot of those were disregarded." "But his were actually being brought to light." "And I think that was part of his beef that he was having was is that other people were being treated differently than what he was being treated." "I was delivering the corrective actions because they were brought to me to be delivered—to be delivered to him." "I looked at the evidence, I looked at the attendance points as they were in—in the computer as his punches and, yes, they're valid." "Were the other 75 employees if some of them had the same attendance issues, were they treated the same—the same way?" "That—I've seen incidences where they haven't." (Denn Dep., Doc. No. 51 Ex. 3, 45:7 – 46:24). Denn did not give examples of similarly situated female employees who were treated differently than plaintiff, however, and plaintiff has not pointed to specific examples of similarly situated female employees who were treated differently. Furthermore, as noted by defendant, none of this testimony actually controverts the fact that plaintiff was written up for being tardy, and Denn's testimony verifies that plaintiff was tardy on those occasions.

43:9-44:8, Doc. No. 49, Ex. 18). Denn, however, testified, "Did I feel that he was being retaliated against personally?" "Yes." (Denn. Dep. Doc. No. 51, Ex. 3, 44:14-45:2).

On July 25, 2012, CSL Plasma observed Carter wearing non-cleanable shoes made of absorbent material, in violation of health and safety policy. See Center Exposure Control Plan, Doc. No. 49, Ex. 7, § 7.3.4.13 ("Open-toed, open-heeled, and shoes of absorbent material are not permitted. . . .." ). CSL Plasma gave Carter, as it does with all employees, the option to go home to change his shoes or to leave early for the day. Carter left early for the day. CSL Plasma did not assess an absence occurrence point because Carter indicated that he did not know this requirement that shoes had to be made of nonabsorbent material. (Heatherman Dec., ¶5, Doc. No. 49, Ex. 1; Center Exposure Control Plan, Doc. No. 49, Ex. 7).[5]

On August 21, 2012, CSL Plasma issued a Performance Corrective Action to Carter after he engaged in a verbal altercation with another male employee on August 15, 2012. Shane Groover, a Medical Operations Supervisor, observed the verbal altercation and originated the corrective action.

---

[5] Plaintiff attempts to controvert, noting that in an email to Darrell Simon, Heatherman stated that Carter "is upset and feels he is being picked on." "Earlier this week he was sent home because he did not have the appropriate shoes on for work (this is the practice for anyone who does not have white non-absorbent shoes per SOP and our center policy)." Darrel Simon responds that he doesn't see any specific reference in the policy that states the shoes must be white. (Doc. No. 51, Ex. 5, Email between Heatherman and Human Resources). Plaintiff also asserts that female employees were not sent home or told to leave for wearing non-white absorbent shoes like Carter; however, in support of this proposition, plaintiff attaches an exhibit entitled "Michael Carter Photos," which are just pictures of shoes, with no context or explanation provided. (Doc. No. 51, Ex. 6.) The Court agrees with defendant that the photos of shoes lack foundation and have no probative value, as no information is provided as to who took the photos, when they were taken, who is in the photos, where the photos were taken, or whether the individuals wearing those shoes were disciplined for wearing them. Consequently, the Court will give no weight to those photographs.

On August 25, 2012, CSL Plasma issued a written warning to Carter because, in addition to his prior verbal coaching and written coaching, Carter was tardy on four additional occasions between July 23, 2012 and August 22, 2012. Justin Gronbach issued the Attendance Corrective Action. (Attendance Corrective Action Report Dated 8/25/2012, Doc. No. 49, Ex. 20). That Attendance Corrective Action Report stated, "please be aware further incidents could result in next level corrective action or termination of employment." (Id.).

On September 6, 2012, CSL Plasma issued a Final Written Warning to Carter because CSL found that plaintiff was out of the production area for two hours but he had only clocked out for a 29 minute lunch break. Gronbach and Cristina Ceniceros issued the Performance Corrective Action Report to Carter. (Performance Corrective Action Report Dated 9/6/12, Doc. No. 49, Ex. 21).[6]

On October 9, 2012, Carter submitted a letter to CSL Plasma resigning his full time employment in favor of a part time position because he "recently attained full time employment with another company . . . ." CSL Plasma accepted Carter's request to move to a part-time position, and he continued working for the company.

Both employees and non-employees who donate blood plasma are compensated for the donation. Individuals who wish to donate plasma must be identified and must answer certain private medical questions. Generally for employees, this process can be completed on a screening kiosk in the collection facility. If there are issues with the screening kiosk, a CSL Plasma employee may ask non-employee donors the required questions. If there are issues with the screening kiosk when the prospective donor is

---

[6] Although plaintiff attempts to controvert this statement through his testimony that he believed he should not have been written up because he was on his lunch break (see Carter Dep., Doc. No. 51, Ex. 4, 135:23 – 136:5), plaintiff's personal belief about his actions does not controvert the fact that a Final Written Warning was issued to him.

7

also an employee, CSL Plasma does not permit its other employees to ask the required health history questions because of privacy concerns for the prospective employee-donor.

On November 28, 2012, Adam Miller ("Miller"), a CSL Plasma employee from another facility, was serving as the supervisory employee at the CSL Plasma collection facility at which Carter was employed. Carter attempted to donate plasma on November 28, 2012 but was unable to donate plasma due to issues with the screening kiosk and because CSL Plasma's policies do not permit other employees to ask Carter the required questions.

According to an email dated December 3, 2012 sent by Miller to Brannon Brittain, plaintiff became agitated about standing in line and not being able to donate. "He than [sic] asked if he resigned right now if we could manually process him. I told him that I could not do that, and that he was not able to donate today. He than [sic] walked way [sic] from the kiosk and toward the front door. He than [sic] asked if he could leave his resignation with me. I told [him] that yes he could if he would like, but he would have to put it on paper for it to be official. We than [sic] walked back to the general office area where I took out some paper for him to write his resignation out. He that [sic] stated that he would info Boca of his decision to resign. I told that he could, but he still needed to write it out with his last day of employment for the center to make it official. He told be [sic] again that he would inform Boca of his decision. I told him that I would let Cristina know about his decision. He stated that he would let Cristina know if he wanted to resign, and that he recanted his decision at this time. After that he left the center and I went and emailed Cristina about the incident." Doc. No. 49-23.

On December 1, 2012, CSL Plasma informed Carter that it had accepted his verbal resignation. (Heatherman Dec., ¶ 12, Doc. No. 49, Ex. 1). In making the decision

8

to accept Carter's verbal resignation, Heatherman stated that, "As to all of the other details that came out after the fact that were investigated by Brannon Brittain, I didn't have all of those details at that time. However, I did know that he said, 'I want to quit'; 'Just kidding, maybe I don't, because I don't want to put it in writing. I'll go to Boca [the headquarters] myself.' An employee that's on a final written warning for performance and a final written warning for attendance and who was part-time, I'm going to accept that resignation. We're not going to go back and forth." (Heatherman Dep., 183:6-17, Doc. No. 52, Ex. 28).

On December 3, 2012, Carter called Brannon Brittain, a CSL Plasma Associate Director, stating that he did not wish to resign. Brittain requested that Carter put in writing, via e-mail, his version of the events from November 28, 2012. On December 4, 2012, Carter e-mailed Brittain about his resignation and requested that he be reinstated. Plaintiff wrote, "[The acting manager] stated that since you're and [sic] employee and the system is not responding you won't be able to donate today. I subsequently ask if had resigned from my status would I be able to donate in that same timeline. He responded it don't [sic] work that way. I replied as a suggestion can we have someone take a look at this inaccuracy because I know that myself an [sic] others employees have this same situational problem. He told me that it was not his job, then he instructed me to resigned [sic] in writing. I declined, he stated thereafter numerous times to me to resigned [sic] in writing. I declined again and again. I stated to him I would take to Christina C. Because I didn't know him and didn't feel comfortable having this conversation with him. I departed to the mens [sic] lockeroom [sic], then I return to ask the manager on duty which he before mentioned that is was himself did he understand the declination of my resignation. He responded clearly that he understood I DID NOT want him to submit a resignation on my behalf in which verbal or written."

9

Doc. No. 49, Ex. 25, p. 1.  In his email from December 4, 2012, plaintiff also indicated that he returned to make a plasma donation on December 1, 2012, and after he completed his donation, he was informed that he needed to have a meeting with "Shane G. and Christina C."  Id., p. 2.  He wrote, "The meeting convene [sic] I ask was this meeting formal or informal, I was told by both parties it was just a meeting.  I was appalled to hear that the verbal resignation was accepted on my behalf by another party.  I was ask [sic] by Christina C. did I have any comments I responded with a low tone no.  Lastly Christina C. asked did I have anything in my locker.  I said yes.  She instructed Shane G. to escort me to the lockeroom [sic].  Thereafter he escorted me out the center as if I had been terminated."  Id.  Plaintiff complained in his December 4, 2012 email, that there were "a great percentage of veterans including myself being terminated or discharge [sic] from employment in some form or fashion."  Id.[7]

After receipt of plaintiff's email and an investigation, CSL Plasma decided to permit Carter to return to work on his next regularly scheduled shift.  Accordingly to their declarations, on or about December 7, 2012, Tricia Jackson ("Jackson"), a CSL Plasma Human Resources employee and Heatherman both called Carter and left him voicemail messages to inform him that he could return to work on his next scheduled shift on December 11, 2012. Carter did not return Jackson's or Heatherman's calls. (Declaration of Tricia Jackson, ¶3, Doc. No. 49, Ex. 26; Heatherman Dec., ¶ 14, Doc. No. 49, Ex. 1; Personnel Action Form dated 12/13/12, Doc. No. 49, Ex. 27; Petition ¶ 38).   Plaintiff testified, however, that no one told him about coming back his next scheduled shift. (Carter Dep., Doc. No. 51, Ex. 4, 158:13 – 158:20).  Carter also testified he does not

---

[7] Although plaintiff attempts to argue in response that all the veterans at CSL Plasma were male and therefore this constitutes a claim of gender discrimination, nothing in the email dated December 4, 2012, indicates that males were being discriminated against.

recall ignoring their calls or receiving voice messages on his phone. Carter Dep., Doc. No. 51, Ex. 4, 154:5-22.[8]

Carter contacted Brittain on December 7, 2012; Brittain informed Carter that CSL Plasma had reinstated Carter's employment and that Carter needed to speak with Heatherman prior to his next scheduled shift on December 11, 2012. (Brittain Dec., ¶8, Doc. No. 49, Ex. 24). Carter attended CSL Plasma's company Christmas party on or about December 9, 2012. At the Christmas party, Heatherman and Carter spoke; Heatherman testified that she told Carter that his next shift was scheduled for Tuesday, December 11, 2012, and requested that Carter call her prior to his next shift. (Heatherman Dep., 193:1-15, Doc. No. 49, Ex. 9; Personnel Action Form dated 12/13/12, Doc. No. 49, Ex. 27). Plaintiff, however, testified that at the Christmas party, Heatherman told him she was going to call him about putting him on the schedule, but did not tell him when his next shift was scheduled. See Carter Dep., Doc. No. 51, Ex. 4, 156:16-18, 158:18-20.[9]

Carter did not show up to work on December 11, 2012, but did show up at the facility to donate plasma. (Heatherman Dec., ¶16, Doc. No. 49, Ex. 1; Personnel Action Form dated 12/13/12, Doc. No. 49, Ex. 27). CSL Plasma attempted to contact Carter on December 11, 2012 to discuss his missed shift. (Petition, ¶40). Carter again failed to show up for his scheduled shift on December 12, 2012. (Heatherman Dec., ¶ 17, Doc.

---

[8] In his Petition (Doc. No. 1-2), however, plaintiff alleged that (1) he ignored calls from CSL Plasma's human resources department and [] Heatherman "because [Carter] no longer was interested in returning to work considering the manner of his dismissal" (Petition, ¶ 38); and (2) "at the company holiday party, [Carter] declined [] Heatherman's offer to put him back on the schedule for the same reason" (Petition, ¶ 39).

[9] Again, as noted by defendant, in plaintiff's petition he alleged that at the Christmas party, Heatherman offered to put him back on the schedule and plaintiff declined that offer. Petition, ¶ 39.

No. 49, Ex. 1; Personnel Action Form dated 12/13/12, Doc. No. 49, Ex. 27). In Carter's petition, however, he alleged that the December 12, 2012 shift was not discussed at the company party, and was not consistent with the hours of availability that he provided (Petition, ¶¶ 43-44).

Carter returned to the facility again on December 13, 2012. At that time, CSL Plasma informed Carter that CSL Plasma terminated his employment for not calling and not showing up for his scheduled shifts on December 11 and December 12, 2012, in violation of the company's attendance-related policies. (Personnel Action Form dated 12/13/12, Doc. No. 49, Ex. 27; Heatherman Dec., ¶ 18, Doc. No. 49, Ex. 1).

The two individuals that were subsequently hired to replace Carter are both males. Additionally, Carter names no similarly situated female employees in his Designation of Discriminatory Incidents whom he claims engaged in the same or similar misconduct, but were treated more favorably. (Designation of Discriminatory Incidents, Doc. No 28).

## II.    Standard

Summary judgment is appropriate if the movant demonstrates that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986). The facts and inferences are viewed in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–90 (1986). The moving party must carry the burden of establishing both the absence of a genuine issue of material fact and that such party is entitled to judgment as a matter of law. Matsushita, 475 U.S. at 586–90.

A nonmoving party must establish more than "the mere existence of a scintilla of evidence" in support of its position. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).

> The nonmovant must do more than simply show that there is some metaphysical doubt as to the material facts, and must come forward with specific facts showing that there is a genuine issue for trial. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.

Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) (citations and quotations omitted)

## III. Discussion

Plaintiff asserts that defendant's actions constituted a violation under the Missouri Human Rights Act ("MHRA"), R.S.Mo. §§ 213.010 et seq. for gender discrimination (Count I) and retaliation (Count II). The Court examines plaintiff's claims, below.

### A. Gender Discrimination under the MHRA

Defendant states that summary judgment is appropriate on plaintiff's gender discrimination claims under the Missouri Human Rights Act (Count I) because plaintiff has no evidence that gender was a contributing factor in his termination. R.S.Mo. § 213.055. To establish a prima facie case of gender discrimination, plaintiff must establish (1) he was a member of a protected class; (2) he was qualified to perform his job; (3) he suffered an adverse employment action; and (4) he was treated differently than similarly situated female employees. Ressler v. Clay County, Missouri, 375 S.W.3d 132, 141 (Mo. App. W.D. 2012) (citation omitted). The fourth factor "can also be met if the employee provides some other evidence that would give rise to an inference of unlawful discrimination." Ruppel v. City of Valley Park, 318 S.W.3d 179, 185 (Mo. App. E.D. 2010) (quotation omitted).

A gender discrimination claim under the MHRA will survive summary judgment if there is a genuine issue of material fact as to whether gender was a "contributing factor"

13

in the defendant's termination decision.  See Daugherty v. City of Maryland Heights, 231 S.W.3d 814, 820 (Mo. banc 2007).  "A 'contributing' factor has been defined as one 'that contributed a share in anything or has a part in producing the effect.'" Williams v. Trans States Airlines, Inc., 281 S.W.3d 854, 867 (Mo.Ct.App.2009) (citing McBryde v. Ritenour Sch. Dist., 207 S.W.3d 162, 170 (Mo.Ct.App.2006)). On considering an MHRA gender discrimination claim on summary judgment, the Court "must determine whether the record shows two plausible, but contradictory, accounts of the essential facts and the genuine issue in the case is real, not merely argumentative, imaginary or frivolous." Daugherty, 231 S.W.3d at 820.

Defendant states plaintiff has no evidence to show he was disciplined or terminated for any reason other than failed job performance and absences.  Defendant notes that plaintiff has no direct evidence[10] of gender discrimination.  Defendant also asserts that plaintiff is unable to demonstrate a prima facie case of discrimination because (1) he cannot demonstrate that he was qualified for his position; (2) he cannot identify any similarly situated female employees who were treated differently than he was treated; and (3) he has no other evidence that gender was a contributing factor to the discipline or termination decisions.  Plaintiff argues that his claims survive summary judgment, as he does not need to show he was qualified for the position and a dispute of material fact remains as to whether gender was a contributing factor to the discipline.

### 1.    Qualified for the position

With respect to being qualified for his position, defendant argues that plaintiff must prove he "was actually performing [his] job at a level that met [his] employer's

---

[10] Direct evidence of discrimination "shows a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding that an illegitimate criterion actually motivated the employment decision."  Burrow v. Boeing Co., No. 4:09CV2073 TCM, 2011 WL 1594937 at *7 (E.D. Mo. April 27, 2011) (quoting Daugherty, 231 S.W.3d at 818).

14

legitimate expectations." <u>Cherry v. Ritenour School Dist.</u>, 253 F. Supp. 2d 1085, 1094 (E.D. Mo. 2003). To demonstrate that plaintiff was not meeting expectations, defendant notes that plaintiff began employment in April 2012, and within five months, he had received: (1) a verbal coaching for attendance; (2) memos to file regarding performance; (3) a written coaching for attendance; (4) a performance corrective action for engaging in a verbal altercation; (5) a written warning for attendance, and (6) a final written warning for taking a two hour lunch, falsifying his time records, and providing false statements to his supervisors. Defendant also notes that after the company had accepted plaintiff's resignation and then offered him his job back, plaintiff failed to show up for work for two scheduled shifts. Defendant states that, on these facts, plaintiff was not meeting defendant's legitimate expectations and was not qualified for his position.

In response, plaintiff argues that he is not required by Missouri law to establish he was qualified for his position in order to make a submissible case. Plaintiff argues that defendant's cases rely on the standards set for under Title VII, which contradict Missouri law and should not be followed. Notably, however, defendant has cited (and the Court has independently found) recent Missouri cases setting forth being qualified for the position as an element of a MHRA discrimination claim. <u>See</u>, <u>e.g.</u>, <u>Ressler v. Clay County, Missouri</u>, 375 S.W.3d 132, 141 (Mo. App. W.D. 2012) (citing <u>Ruppel</u>, 318 S.W.3d at 185). Plaintiff also argues that he can set forth evidence demonstrating a genuine dispute of material fact that he was qualified for his position as CSL Plasma, arguing that he was not reprimanded for attendance until after he complained about feeling as though he was a victim of gender discrimination.

The difficulty with plaintiff's argument, however, is that there is no evidence that he complained of gender discrimination to any decision-maker prior to his reprimands; instead, at best, he complained of "BACKLASH resulting in an inaccurate (6/8/12)

15

corrective action" after receiving a written coaching regarding attendance in June 2012 (which was long after he had already received his first Attendance Corrective Action Report for tardiness). Although Carter testified he believed he was being reprimanded because of his gender and he reported his beliefs to "the supervisors that were male that would listen," there is no indication when these reports were made, and no indication that these beliefs were passed on to Heatherman. Furthermore, plaintiff does not actually dispute that he had attendance and performance issues. Indeed, it appears from all evidence of the record that plaintiff was not meeting his employer's legitimate expectations at the time of his termination. Therefore, summary judgment on the gender discrimination claims should be granted on this basis.[11]

### 2. Similarly-situated female employees

Defendant also argues that plaintiff cannot identify any similarly situated female employees who were treated differently or more favorably than he was. Plaintiff alleges in his petition that female supervisors allowed female subordinates to violate company policies and procedures and did not receive write-ups for the same actions taken by plaintiff. See Petition, Doc. No. 1-2, ¶¶ 47-48. Defendant states these assertions fail because plaintiff cannot identify any females who were similarly situated yet treated differently. See Lovland v. Employers Mut. Cas. Co., 674 F.3d 806, 814 (8th Cir. 2012); Burrow, 2011 WL 1594937, at *9-10; Thomas v. Kansas City, Mo. Police Dep't, No. 04-0626-CV-W-RED, 2006 WL 27117, at *10 (W.D. Mo. Jan. 5, 2006). Defendant asserts that plaintiff has not identified female employees who worked in the same position as him with attendance issues, altercations with others, or who wore non-conforming shoes. He has also not identified anyone who attempted to donate plasma, became

---

[11] Given that plaintiff has raised an issue about this factor's applicability under Missouri law, however, the Court will consider defendant's remaining arguments as well.

16

upset when the screening kiosk did not identify her, offered her resignation to be able to donate, and then rescinded the resignation. He also has not identified a female employee who refused an offer to return to work and/or was more favorably treated than plaintiff when that female employee did not show up for two scheduled shifts.

In response, plaintiff correctly notes that under the MHRA, he is not necessarily required to demonstrate that defendant treated similarly-situated females differently; instead, he could make a submissible case by providing some other evidence giving rise to an inference of unlawful discrimination. See Holmes v. Kansas City Mo. Bd. of Comm'rs, 364 S.W.3d 615, 627 (Mo. App. W.D. 2012). In the alternative, plaintiff argues that he is able to show that female employees were similarly situated yet treated differently, arguing that the evidence shows that he was sent home for his shoes, yet no females wearing non-conforming shoes were sent home. He also argues that male employees were held to a higher and different standard than female employees.

Although plaintiff is correct that he does not necessarily have to demonstrate that similarly situated females were treated differently than he, the Court notes that the basis for plaintiff's gender discrimination claim in his initial petition was that females were treated differently. Furthermore, as defendant notes in reply, the time for identifying similarly-situated females has passed; when a defendant argues on summary judgment that plaintiff has no evidence that females were treated differently, plaintiff's response must demonstrate that defendant is incorrect. Just because plaintiff now claims he has the ability to identify similarly-situated females at trial does not prevent summary judgment from being entered, as plaintiff has not specifically identified the female employees who were treated differently than he was, nor has he identified how they were treated more favorably, when such actions occurred, or what position those women held in the company. The Court finds that plaintiff is unable to demonstrate that

17

he was treated differently than similarly-situated females. The Court will next turn to whether plaintiff can demonstrate that his gender was otherwise a contributing factor to his termination.

### 3. Gender as a contributing factor to termination

Finally, defendant argues that plaintiff has no evidence beyond his own speculation, belief, and conclusory, self-serving statements, that his gender was a contributing factor to his ultimate discharge from CSL Plasma. Burrow, 2011 WL 1594937, at *10; Thomas, 2006 WL 27117 at *10. Defendant states that there is no evidence that gender had anything to do with the acceptance of plaintiff's resignation, or his termination for not calling and not showing up for work. Instead, defendant argues that the facts show that plaintiff was counseled multiple times for attendance and performance issues, and the failure to show up for work in December 2012 was simply the last straw. See Hood v. Aaron Rents, Inc., No. 4:08CV1975 JCH, 2009 WL 4828709 at *1-6 (Dec. 7, 2009); Farnsworth v. Covidien, Inc., No. 4:08CV01689 ERW, 2010 WL 147812, *16-17 (E. D. Mo. Jan. 11, 2010); Reyna v. Barnes & Noble Booksellers, No. 08:00369-CV-W-DGK, 2009 WL 929135 at *5 (W.D. Mo. April 3, 2009). Further, defendant notes that the next two individuals hired into plaintiff's position were males, directly contradicting any argument that plaintiff was discriminated against because of his gender.

Plaintiff argues that questions of material fact remain as to whether gender was a contributing factor to the adverse employment decision. Plaintiff then asserts that he has established that gender was a contributing factor by demonstrating that he was reprimanded and ultimately terminated for the same conduct that female employees were not penalized for doing. Plaintiff states that this argument is made not only upon his personal belief, but that many others (such as employees Kristina Todd, Thomas

18

Denn, and Kenneth Lain) testified that males were treated differently and held to a higher standard. Notably, however, as pointed out by defendant, Kenneth Lain's deposition was taken in a different lawsuit on July 18, 2014, over a month and a half after discovery closed in the present lawsuit, and therefore will not be considered as evidence in plaintiff Carter's case. Additionally, Ms. Todd's affidavit was produced in the lawsuit filed by Thomas Denn, not the present lawsuit. And, as noted by defendant, neither Todd's nor Lain's testimony provide any factual support for plaintiff's position. When questioned, Todd indicated that he had never seen Ms. Heatherman treat Michael Carter unfairly (Doc. No. 52, Ex. 31, p. 16:7-9), and that Lain did not believe Ms. Heatherman treated Lain differently based on his gender (id., 55:12-15). Ms. Todd's affidavit does not provide any information about the female employees who she believes were treated better than Carter, or how they may have been treated more favorably.

Plaintiff also argues that gender discrimination was a contributing factor to his termination, in that (1) his resignation was accepted even though he had no intent to resign; (2) even though defendant claims plaintiff was later awarded his employment back, plaintiff was compensated as a non-employee on one of the days when he was allegedly no-call, no-show, demonstrating that he was not employed by defendant at this time; (3) plaintiff received a write-up from a female supervisor regarding phone use that was later thrown out by Denn because Denn believed the complaint lacked merit; (4) plaintiff was reprimanded for his attendance as a result of him complaining to Heatherman and also because he was a male; and (5) Denn testified he believed defendant was looking for little things they could use to terminate plaintiff when other employees were overlooked for such infractions.

Upon considering plaintiff's assertions that he has demonstrated that questions remain as to whether gender discrimination was a contributing factor to his termination, the Court finds that plaintiff has failed to provide sufficient evidence to avoid summary judgment. Plaintiff's resignation was initially accepted by a male employee, Adam Miller, and there is no indication from the record that the decision to pass the resignation on to Heatherman was motivated by plaintiff's gender. Whether plaintiff was considered an employee when he donated blood on December 11, 2012 is of no importance to the consideration of whether gender discrimination could be a contributing factor in his treatment. Additionally, plaintiff claimed in his initial petition that he ignored calls from his supervisors regarding return to work. The issue regarding the write-up regarding cell phone use that was later thrown out by Denn does not demonstrate gender discrimination, and does not demonstrate that plaintiff was written up for tardiness in retaliation for that complaint being thrown out. Finally, Denn's belief that defendant was looking for small infractions as to plaintiff does not demonstrate that his gender was a contributing factor to those decisions. Instead, as stated by defendant in its reply (Doc. No. 52, p. 19), the logical reading of the facts in this case leads to the conclusion that plaintiff, a part-time employee already on final written warnings, offered his resignation and that resignation was accepted. When plaintiff complained that defendant allegedly terminates people before its holiday party and treats veterans differently, defendant made a decision to offer plaintiff his job back. Plaintiff ignored defendant's telephone calls about the job offer, but attended the company employee holiday party. After missing two shifts, he was terminated. Given plaintiff's history of performance and attendance problems and the lack of any evidence beyond plaintiff's speculation and his self-serving statements that his gender was a contributing factor to his ultimate discharge from CSL Plasma, the Court cannot find facts sufficient to support

20

an inference of discrimination. Therefore, the Court finds that summary judgment should be granted as to plaintiff's complaints of gender discrimination under the MHRA.

**B.    Retaliation under the MHRA**[12]

To establish a *prima facie* case for retaliation under the MHRA, the plaintiff must prove that: (1) he complained of discrimination; (2) the defendant took an adverse action against him; and (3) a causal relationship existed between his complaint and the adverse action. McCrainey v. Kansas City, Missouri Sch. Dist., 337 S.W.3d 746, 753 (Mo. App. W.D. 2011). A plaintiff's general, conclusory allegations and opinions, without more, are not sufficient to raise an inference of retaliation. Palesch v. Missouri Com'n on Human Rights, 233 F.3d 560, 570 (8th Cir. 2000). Furthermore, temporal proximity between the complaint of discrimination and the adverse action, without more, does not create the necessary causal connection. See, e.g., Kipp v. Mo. Highway Transp. Comm'n, 280 F.3d 893, 897 (8th Cir. 2002); Medley v. Valentine Radford Comm'ns, Inc., 173 S.W.3d 315, 325-26 (Mo. App. W.D. 2005).

Defendant argues that plaintiff's retaliation claims fail because (1) plaintiff did not engage in a protected activity; and (2) there is no evidence of a causal connection between any protected activity and the adverse employment action.

1.    Protected Activity

A plaintiff can oppose a practice which is not actually unlawful under the MHRA, yet still proceed with a retaliation claim.  McCrainey v. Kansas City Missouri School Dist., 337 S.W.3d 746, 753 (Mo. App. W.D. 2011).  A plaintiff needs to only have a good

---

[12] Although defendant also asserts that it had a legitimate, non-retaliatory reason for plaintiff's termination, the Court agrees with plaintiff that under the MHRA, that appears to not be a factor for consideration on summary judgment.  See Hill v. Ford Motor Co., 277 S.W.3d 659, 664 (Mo. 2009).

21

faith, reasonable belief that the conduct opposed was protected by the MHRA in order to proceed on a retaliation claim. Id. at 754.

With respect to whether plaintiff engaged in protected activity, defendant notes that the only two alleged acts of protected activity are the "BACKLASH" statement from June 12, 2012, and the email to Brittain in December 2012. Defendant indicates that plaintiff's "BACKLASH" complaint in June 2012 was nothing more than plaintiff's complaint about receiving a corrective action a few days after receiving a memo to file, but no discipline, for violating another company policy. The "BACKLASH" complaint does not mention discrimination or harassment due to a protected characteristic under the MHRA. Instead, plaintiff wrote on the Attendance Corrective Action Report, "I believe that this is a BACKLASH resulting in an inaccurate (6/8/12) corrective action. The corrective action for 6/10/12 is 36 days after 5/4/12. I was never notified of tardiness." Doc. No. 49, Ex. 16.

Defendant also asserts that plaintiff's December 4, 2012 email to Brannon Brittain regarding defendant's decision to accept his resignation is not protected activity. Within that email, plaintiff complained about defendant's decision to accept his resignation, and stated his belief that defendant was attempting to eliminate personnel around the time of the company Christmas party. Within that email, he also complained that military veterans were being treated differently. However, the consequence of plaintiff sending this email was defendant inviting plaintiff back to work on his next scheduled shift. As pointed out by defendant, plaintiff admits he ignored calls from defendant and declined offers to put him back on the schedule.

In neither of these statements did plaintiff complain about gender discrimination, or any other kind of discrimination actionable under the MHRA. Although plaintiff argues he reported gender discrimination to his supervisor, Heatherman, after the June

22

12, 2012 write up, there is no evidence in the record that he complained of gender discrimination or harassment at all on June 12, 2012.  Plaintiff also argues that the email to Brittain should be considered engaging in a protected activity because plaintiff complained about his belief that he and others were being targeted because they were veterans.  Plaintiff's counsel argues that although plaintiff did not complain at this time about gender discrimination because he had already complained to Heatherman, the claim regarding discrimination against veterans should be implied to be a gender discrimination claim because the only veterans employed at CSL Plasma were male.  Plaintiff also argues that he had no knowledge of the two shifts he was scheduled to work after he was invited back, and that he never knew that he had been reinstated.

The Court agrees with defendant that plaintiff did not engage in protected activity.  The "BACKLASH" complaint does not relate to or mention gender in any way, and there is no evidence in the record that plaintiff complained of gender discrimination (or any other type of discrimination or harassment that could be actionable under the MRHA) in June 2012.  Furthermore, to the extent plaintiff may argue that he told male supervisors that he believed he was being discriminated against on the basis of his gender, there is no information in the record as to when these conversations may have taken place, nor is there any indication that Heatherman knew about these conversations.  Additionally, the December 2012 email to Brittain does not allege discrimination based on a protected classification under the MHRA.  At best, that email might be read as making a "veteran status" claim under the Uniformed Services Employment and Reemployment Rights Act (USERRA), 38 U.S.C. §§ 4311 et seq.; it certainly does not make a claim for

discrimination based on gender. Therefore, the Court finds that defendant's motion for summary judgment on plaintiff's MHRA retaliation claim must be granted.[13]

        2.    Causal connection

Defendant also argues there is no evidence of a causal connection between the "BACKLASH" comment in June 2012 and the alleged adverse employment actions (plaintiff's resignation being accepted in early December 2012, and his eventual termination on December 13, 2012 for failing to call or show up for work two days in a row). The Eighth Circuit has repeatedly recognized that "a gap in time between the protected activity and the adverse employment action weakens the inference of retaliatory motive." Wells v. SCI Management, L.P., 469 F.3d 697, 702 (8th Cir. 2006) (citing Hesse v. Avis Rent A Car Sys., Inc., 394 F.3d 624, 633 (8th Cir. 2005)) (upholding summary judgment on retaliation claim).

Furthermore, as noted by defendant, plaintiff's petition does not even claim that he was terminated on December 13, 2012, but rather alleged that after being invited to return to work, plaintiff was not interested in returning. See Petition, ¶ 38 ("On December 7, 2012, Plaintiff ignored phone calls from Trish Jackson, a Human Resources employee, and Defendant Heatherman, because Plaintiff no longer was interested in returning to work considering the manner of his dismissal."). This, in defendant's view, means that plaintiff's termination on December 13, 2012 was not even an adverse action and would also defeat Plaintiff's *prima facie* case. See McCrainey, 337 S.W.3d at 753 (identifying the prima facie case requirements); Lovland, 674 F.3d at 813 (granting summary judgment and finding that a corrective action that resulted in termination based on no-call-no-show absences was not an adverse action).

---

[13] The Court will also consider, in the alternative, whether there is evidence of a causal connection between the alleged protected activity and any adverse action.

Case 4:13-cv-00814-FJG   Document 54   Filed 10/24/14   Page 24 of 26

In addition, defendant argues the evidence does not show a connection between plaintiff's December 4, 2012, complaints about military veterans being treated differently and plaintiff's termination on December 13, 2012 due to failure to show up for two consecutive shifts after numerous previous attendance corrective action reports. Defendant states this is especially true given that plaintiff admitted he ignored defendant's telephone calls, attended defendant's Christmas party and spoke to Heatherman but "declined [her] offer to put him back on the schedule," (Petition ¶ 39), and failed to show for his shift on December 11, 2012 even though he went to the facility the same day to donate plasma. Defendant states that these facts do not demonstrate retaliation, and instead show "that CSL Plasma virtually bent over backwards to allow Carter to return to work and only terminated his employment after he refused calls and messages and failed to show up to work after a long history of attendance corrective actions and a final written warning for performance." Doc. No. 49, pp. 24-25.

In response, plaintiff argues that he has established a causal connection between the protected activity and the adverse employment actions. Plaintiff argues that the June 12, 2012 attendance corrective action report was itself retaliation for him reporting to Heatherman about the gender discrimination he endured. However, there is no indication in the record that plaintiff reported gender discrimination to Heatherman on June 12, 2012 or at any other time. Plaintiff also points to Denn's testimony that defendant was targeting plaintiff and reprimanding him for conduct other employees were not reprimanded for; however, there is no evidence in the record about other similarly-situated employees.

Viewing the evidence in the light most favorable to the plaintiff, the Court finds that plaintiff has not demonstrated a causal connection between any of the alleged protected activity and any adverse employment action. The June 12, 2012 "BACKLASH" complaint was remote in time from defendant accepting plaintiff's resignation and defendant later terminated plaintiff for the no-call no-shows. Additionally, the result of plaintiff's December 4, 2012 email was defendant offering plaintiff his job back. When plaintiff did not respond to phone calls and failed to show up to work (despite attending an employee Christmas party a few days before his next scheduled shift), defendant terminated him. Under these facts, plaintiff cannot demonstrate an inference of a causal connection between alleged protected activity and alleged adverse actions. Summary judgment must be granted.

## IV. Conclusion

Accordingly, for all the reasons stated herein, defendant's motion for summary judgment (Doc. No. 48) is **GRANTED**.

**IT IS SO ORDERED.**

Date: October 24, 2014                                    **/S/ FERNANDO J. GAITAN, JR.**
Kansas City, Missouri                                        Fernando J. Gaitan, Jr.
                                                                        United States District Judge